[Crim. No. 11738.   Second Dist., Div. Five.   Aug. 13, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES BERNARD BRYANT, Defendant and Appellant.

*Assigned by the Chairman of the Judicial Council.

Velma E. Williams, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Clifford L. Schaffer, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, P. J.—On February 24, 1965, there was filed an information charging defendant with burglary. (Pen. Code, § 459.) He was arraigned the same day. On March 2, 1965, he pleaded guilty. A probation report was ordered.

The report revealed the following matters: defendant was born in Mississippi in 1940. He moved to California with his parents when he was two years old. His involvement with the law started ten years later. In 1952 he came to the attention of the juvenile authorities when he committed arson. A clinical study indicated "that he appeared to be seeking an acceptable level of adjustment and identification with his parents and was in need of assistance in resolving his hostile feelings due to conflict between him and his mother. . . ." He again committed arson in 1953. That time a clinical study indicated a "disturbance in the psychosexual development; the incendiarism was of a compulsive nature and revealed an intense repressed destructive hostility." He was committed to the California Youth Authority. Defendant was paroled in March 1955. In July of that year he attempted extortion by telephone and was recommitted to the Youth Authority. After being again paroled, he was recommitted for a violation of section 288a of the Penal Code.

His adult history started in June 1961 when he again committed arson. In connection with the criminal proceedings resulting from that act he spent some time at the Metropolitan State Hospital. Eventually he was put on probation for three years, one of the conditions being that he cooperate with the probation officer in a plan for psychiatric treatment. About a year later he was arrested for assault with a deadly weapon, but released. No charges were filed. In 1964 he was jailed for three days for a traffic violation. In the same year he was convicted of possession of dangerous drugs.

The burglary of which he was convicted in the case at bar was a clumsy attempt to recoup personal property which he had given to a certain woman, hoping that she would buy it. Unfortunately defendant took other property while he was in the apartment in question.

The probation report included a statement from a Doctor Drury at the Metropolitan State Hospital, where defendant had been rehospitalized in September and October 1964. We quote a relevant portion of the report: "Diagnosis: Schizophrenic Reaction, Chronic Undifferentiated Type. Prognosis: Guarded. Psychological Report: Borderline normal IQ. This patient appears to be a very immature individual, extremely dependent, needs for affectional gratification are very strong —childlike. Physical and neurological examinations are essentially normal. Negative serology. Hematology and urinalysis —within normal limits. Negative chest X-Ray. We note from his chart that he has had experience as an auto body worker. 10-8-64: Discharged, improved. Is able to return to work."

Defendant addressed a letter to the probation officer in which he claimed that he was too drunk to know what he was doing when he committed the burglary and that the crime was the result of bad associations. He added: "Since the doctor had been helping me I've been a change [sic] man in a lot of ways. I have had a mess [sic] up life but now I am beging [sic] to see my mistake and am going to do right."

On March 24, 1965, defendant was referred to Department 95 for a medical examination. On March 26, he was found to be a mentally ill person and committed to Camarillo State Hospital. Actually defendant was sent again to the Metropolitan State Hospital. He again appeared in court on June 17, 1965, when a supplemental probation report was ordered. That report showed that the probation officer had had a telephone conversation with the secretary of the same Doctor Drury, previously mentioned, who read to him from the defendant's chart which indicated that defendant had recovered from a psychotic episode, was able to respond to the charges against him and had been discharged under the provisions of section 6729 [sic] of the Welfare and Institutions Code.

On July 12, 1965, the superior court started proceedings for an examination of defendant under the provisions of section 1203.03 of the Penal Code and on August 3, 1965, defendant was actually committed under that section. An extensive psychiatric workup was performed at the California Institute for

Men at Chino. Relevant findings were that defendant was ''at least of dull-normal intelligence with an overall I.Q. of 83. . . . His reality orientation was within normal limits. His insight and judgment appeared poor. There were no signs of organic brain damage and/or overt psychosis in the test material or on interview.'' The diagnostic impression was: ''Schizophrenic reaction, chronic undifferentiated type, in fair remission with antisocial behavior.'' On November 4, 1965, defendant appeared for sentence.

Mr. Fujisaki, a deputy public defender, appealed for probation coupled with a psychiatric rehabilitation program. There followed a dialogue between the court and Mr. Fujisaki during which the court said: ''No, I certainly don't consider him a safe person to subject the public to at this point, counsel. I think he has deep seated psychiatric problems and he ought to be treated for it. Probation is denied.'' The court recommended confinement at Vacaville.

The principal claim on appeal is that on the authority of *Pate* v. *Robinson*, 383 U.S. 375 [15 L.Ed.2d 815, 86 S.Ct. 836] and *People* v. *Pennington*, 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942], the court was compelled to entertain a doubt of defendant's ability to understand the nature and purpose of the proceedings taken against him and to assist counsel in the conduct of a defense in a rational manner. It is then argued that at no time did defendant receive the hearing contemplated by sections 1368 et seq. of the Penal Code. (*People* v. *Westbrook*, 62 Cal.2d 197 [41 Cal.Rptr. 809, 397 P.2d 545].)

Undoubtedly everybody who came into contact with the defendant—judges, lawyers and doctors—reached the conclusion that defendant was mentally ill. There is, however, not a shred of evidence in the record that defendant suffered from the type of mental illness which would have precluded the People from proceeding against him because of section 1367 of the Penal Code. In fact the only statement in the record directed to that particular issue is the probation officer's report of what Doctor Drury's secretary read to him from defendant's chart and that statement supports the court's further proceeding against defendant.

We believe that *People* v. *Laudermilk*, 67 Cal.2d 272 [61 Cal.Rptr. 644, 431 P.2d 228] is dispositive of this appeal. There the Supreme Court said: ''An examination of decisions falling into the second category leaves us with the conviction that even under the substantial evidence test of *Pate* and

*Pennington* more is required to raise a doubt than mere bizarre actions *(People* v. *Kroeger* (1964) 61 Cal.2d 236, 243-244 [37 Cal.Rptr. 593, 390 P.2d 369]) or bizarre statements *(People* v. *Williams* (1965) 235 Cal.App.2d 389, 398 [45 Cal. Rptr. 427]) or statements of defense counsel that defendant is incapable of cooperating in his defense *(People* v. *Dailey* (1959) 175 Cal.App.2d 101, 108-109 [345 P.2d 558]) *or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense (People* v. *Jensen, supra,* 43 Cal.2d 572, 579 [275 P.2d 25])." *(Ibid.,* p. 285. Italics ours.)

■ A subsidiary point made by defendant is that he was denied the effective assistance of counsel because, in all, six different deputy public defenders appeared for him at various stages of the proceedings.[1] We fully appreciate that from a psychological point of view a defendant is more likely to feel that he has a champion if the deputy public defender who meets him at the time of the arraignment in the municipal court handles his case all the way. We recognize, however, that in a county of this size, efficiency and economy make it impossible for the public defender to provide this kind of service.

In the case at bar we can find no detriment of substance suffered by defendant as a result of his having been represented by a number of deputies. The reporter's transcript indicates that at the time of sentence Mr. Fujisaki was familiar with the record, had been in touch with defendant's mother on several occasions and was fully aware of the defendant's problems.

The judgment is affirmed.

Stephens, J., and Moor, J. pro tem.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 9, 1968.

---

[1]Actually there were only five. The minute order for the proceedings in connection with the sentence indicates that a Mr. Kojima appeared for defendant, but the reporter's transcript shows that defendant was represented by Mr. Fujisaki who had appeared for him at the time he was committed under section 1203.03 of the Penal Code and at a continuance on October 29, 1965.

*Assigned by the Chairman of the Judicial Council.