[Crim. No. 1388. Fifth Dist. Aug. 17, 1973.]

In re LEONARD ELLSWORTH MILLER on Habeas Corpus.

[Crim. No. 1398. Fifth Dist. Aug. 17, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
LEONARD ELLSWORTH MILLER, Defendant and Appellant.

1006

## Counsel

Hadden W. Roth, under appointment by the Court of Appeal, for Petitioner and for Defendant and Appellant.

Evelle J. Younger, Attorney General, Herbert L. Ashby and Edward A. Hinz, Jr., Chief Assistant Attorneys General, William E. James and Doris

H. Maier, Assistant Attorneys General, Daniel J. Kremer, Charles P. Just, Arnold O. Overoye and James T. McNally, Deputy Attorneys General, for Respondent and for Plaintiff and Respondent.

**OPINION**

**GARGANO, J.**—On February 11, 1970, the Grand Jury of Stanislaus County returned an indictment in the superior court of that county charging Leonard Ellsworth Miller, hereafter referred to as defendant, with murder in violation of Penal Code section 187, assault to commit murder in violation of Penal Code section 217, grand theft of a firearm in violation of Penal Code sections 484-487, subdivision 3, and auto theft in violation of Vehicle Code section 10851. Defendant was an indigent and the Public Defender of Stanislaus County was appointed to represent him.

On February 27, 1970, defendant entered pleas of not guilty and not guilty by reason of insanity to all counts; thereafter, the court appointed two alienists to examine defendant in order to investigate his sanity as of the time of the commission of the alleged offenses.

On March 12, 1970, the public defender moved for a change of venue, asserting that appellant could not receive a fair and impartial trial in Stanislaus County. Counsel, however, did not supply the court with newspaper articles or transcripts of radio broadcasts or television telecasts; nor did he supply the court with opinion polls or request funds to conduct such polls. The motion was based solely on the defendant's conclusionary affidavit that "up to the present date newspapers of general circulation in Stanislaus County, radio stations and television stations have given a disproportionate amount of space and time to this case in all of its aspects."

On April 7, 1970, the cause proceeded to jury trial and defendant was convicted on all counts; the jury found defendant guilty of first degree murder but could not agree on the death penalty. A second jury recommended the death penalty, and defendant was sentenced to death.

Defendant's automatic appeal to the Supreme Court was transferred to this court by the high court after its decision in *People* v. *Anderson,* 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], holding the death penalty to be unconstitutional. At the same time the Supreme Court transferred to this court defendant's petition for writ of habeas corpus; defendant

had petitioned for the writ on the ground that he was denied effective representation by counsel in violation of the federal Constitution. Because this fundamental issue is also the main issue raised in the appeal, we have consolidated the habeas corpus proceeding with the appeal.

The facts are these.

On January 27, 1970, at about 3 p.m., two men, wearing dark clothes and felt hats, walked up to the counter of the Central Valley National Bank in Hughson, California, and asked for the manager; the men were holding guns and nylon stockings concealed their faces. Robert McDonnell responded and he was ordered to lock the bank doors; one of the robbers accompanied McDonnell to the door while the other ordered the employees to move to the rear of the bank and to lie down. Then, the robbers directed Larry Williams to fill two bags with money. As Williams was filling the bags, the phone rang and Estalene Smart was ordered to answer it; a silent alarm had been triggered, alerting the Stanislaus Sheriff's office, and Mrs. Smart managed to indicate to the caller that a robbery was in progress. A few moments later one of the robbers accidentally tripped off a second alarm, and when he told his partner what had happened the two men left the bank.

Charles Moore and Bill Dickens of the Stanislaus County Sheriff's office were the first police officers to arrive at the scene of the robbery; they saw a man in dark clothing walking away from the bank in a southerly direction. They ordered the suspect to stop and put his hands up. Moore heard a burst of gunfire to his right, and as he turned he saw Dickens falling to the ground; the second robber, later identified by Moore as defendant, was running toward Moore firing a raised gun. The officer emptied his own gun at defendant, and on the fourth or fifth shot saw him grab his right chest with his right hand and double over. The two robbers jumped into the police car and escaped. A police search of the area disclosed an Impala Chevrolet with a Newport Beach license; the keys were in the ignition, and a 5-gallon gasoline can and wire cutters were in the car.

Officer Dickens died of his gun wounds on the evening of January 27, 1970. On the same evening agents of the Federal Bureau of Investigation contacted the registered owner of the abandoned Chevrolet and were told that the automobile had been sold to a Jose Bouchot a few days earlier. From Bouchot's girlfriend, the agents learned that Bouchot had arranged to meet with the robbers at Altaville at midnight; the officers met Bouchot and told him what he had to do.

In Altaville, the robbers shot their way out of the police trap and again escaped in the stolen police vehicle. They were subsequently spotted by Deputy Sheriff Bowling and Officer Banks of the San Joaquin County Sheriff's office, and after a gun battle defendant was wounded and apprehended; the other robber, one Charles Porter, escaped temporarily but was killed a short time later. Various items, including 12 unfired rounds of .38 automatic ammunition, a pair of pliers, a towel, a pair of gloves and a $100 bill were found in defendant's possession; nylon stockings, money, bank bags and Officer Dickens' gun were found in the stolen police car.

Defendant was taken to the hospital by Deputy Sheriff Brown; Brown advised defendant of his constitutional rights and conversed with him. Defendant admitted that he participated in the bank robbery and said that the $100 bill found in his possession came from the bank in Hughson. He also admitted having a .32 caliber Beretta in his possession and told Brown where to find it; the bullets removed from Dickens' body were fired from this gun.

The Attorney General argues, preliminarily, that this court does not have jurisdiction to consider the petition for a writ of habeas corpus because appellant is not incarcerated within the territorial jurisdiction of the Fifth District Court of Appeal; he admits that the Supreme Court could confer jurisdiction on this court even though defendant is incarcerated in Folsom Penitentiary but insists that the high court did not do so because it did not issue a directive that we consider the petition. The Attorney General also argues that the petition should be dismissed because the adequate representation by counsel issue is raised in the appeal and, hence, defendant has an adequate remedy by way of appeal.

There is no merit to either argument. As to the first point, the appeal and the petition for writ of habeas corpus were transferred by the Supreme Court to this court at the same time, and implicit in the orders of transfer is the directive that we consider both matters; otherwise, in transferring the petition for writ of habeas corpus the Supreme Court performed an idle act. As to the second point, it is the Attorney General's position that the newspaper articles upon which defendant relies to argue that he did not receive effective representation of counsel in the court below were not part of the record on appeal; if this is true, the only manner in which defendant can receive comprehensive appellate review of the basic constitutional issue he has raised is through habeas corpus proceedings.

We turn to the merits of defendant's contention that he did not receive effective representation by counsel, based, primarily, upon the

denial of his motion for a change of venue, the court's failure to inquire into his reasons for requesting a substitution of attorneys, and the public defender's failure to explore the defense of diminished capacity.

We consider first the change of venue.

■ A change of venue must be granted when the defendant shows " 'a reasonable likelihood that in the absence of such relief, a fair trial cannot be had.' " (*Frazier* v. *Superior Court,* 5 Cal.3d 287, 294 [95 Cal.Rptr. 798, 486 P.2d 694]; *Maine* v. *Superior Court,* 68 Cal.2d 375, 383 [66 Cal.Rptr. 724, 438 P.2d 372].) If the issue is raised on a petition for writ of mandate, or after trial on appeal from a judgment of conviction, the reviewing court must make an independent evaluation of the circumstances and must satisfy itself de novo that defendant obtains a fair and impartial trial (*People* v. *Welch,* 8 Cal.3d 106 [104 Cal.Rptr. 217, 501 P.2d 225]; *People* v. *Tidwell,* 3 Cal.3d 62 [89 Cal.Rptr. 44, 473 P.2d 748]; *Maine* v. *Superior Court, supra,* 68 Cal.2d 375); the factors to be considered are the nature and gravity of the offense, the size of the community, the status of the defendant in the community, the popularity and prominence of the victim, and the nature and extent of the news coverage. (*People* v. *McKay,* 37 Cal.2d 792 [236 P.2d 145]; *Maine* v. *Superior Court, supra,* 68 Cal.2d 375; *Fain* v. *Superior Court,* 2 Cal.3d 46 [84 Cal. Rptr. 135, 465 P.2d 23].)

■ When all of the pertinent factors of this case are considered carefully, it is not only very clear that there was a reasonable likelihood that a fair trial could not be had in Stanislaus County, but it is difficult to believe that an impartial trial was possible in that county.

First, defendant was charged with a capital offense, the brutal slaying of a police officer; it was stated that he had shot the officer in the back during the commission of a bank robbery. Furthermore, defendant was a stranger to the community, and he was a person with a bad reputation; it was reported that he had spent 26 years of his life in penal institutions.

Second, the murder victim was a popular policeman; he was described as a "friend of youth," a "guy with no enemies," and "extremely popular." In fact, two days after the slaying flags were flown at half mast and remained at half mast until the funeral; also, a scholarship was established in his name, and public donations for the scholarship were channeled through the sheriff's office.[1]

---

[1] In describing Officer Dickens, defendant's own counsel had this to say: "I happen to be personally acquainted with Mr. Dickens. I know him to be a fine young man, a very, an outstanding police officer and just a real nice guy. And there's nobody more regretful than I am of what happened. I still have my job to do."

Third, Stanislaus County is a relatively small community, and the local newspaper coverage was sensational and inflammatory. The robbery and the subsequent gun battles, as well as the slaying of Charles Porter, were vividly described. The media reported that defendant and Charles Porter had long criminal records, that they had served together in a federal prison in Washington, that appellant had been released from an Oregon prison "after serving a term for kidnapping a policeman," that defendant had spent 26 years of his life in prison, that defendant and Porter were involved in "armed robberies from Oregon to Hughson," including an $8,000 holdup in San Francisco and the robbery of a Safeway store. The following headlines appeared:

"BANK ROBBERS KILL DEPUTY.

"A DESPERATE MAN IS FLEEING OR HE MAY BE NEARBY.

"500 ATTEND LAST RITES FOR SLAIN LAWMAN.

"ACCUSED KILLER OF DEPUTY IS READ CHARGES.

"KILLERS ARE LINKED TO OTHER HOLDUPS.

"BANK ROBBERS ARE TIED TO CRIME ORGY.

"LARGEST FUNERAL IN MODESTO IS HELD FOR OFFICER DICKENS."

The coverage of the slain officer's funeral and constant reminders of the plight of his widow and surviving children were particularly pervasive. For example, articles published about the funeral were accompanied by a picture of the honor guard flanking the open casket and by a large graveside photograph of the bereaved widow; the articles stated that more than 700 persons had attended the funeral, that it took more than 30 minutes for the line of mourners to file past the open casket, that a procession of patrol cars more than a mile long followed the casket to the grave, and that white-gloved deputies saluted their fallen comrade. One article went on to describe, poignantly, that "[w]omen wept and the chins of strong men trembled" as they buried Billy Joe Dickens in the shade of a pine tree on a grassy slope and that a "chill west wind tugged at a canopy over the grave."

The Attorney General cannot deny that the "reasonable likelihood" test is applicable even though the venue issue is raised on appeal after conviction. (*People* v. *Tidwell, supra,* 3 Cal.3d 62, 69.) He argues that because the newspaper articles we have reviewed were not considered by the trial judge, they cannot be considered by this court. He also argues

that most of the pretrial newspaper publicity occurred during the week following the commission of the crime and that any prejudice which may have resulted from that publicity should have been dissipated by the time of trial. Finally, the Attorney General suggests that in determining whether error occurred in this case, we should be guided " 'by the actualities of *voir dire* and of trial.' " (*People* v. *Blake,* 21 Cal.App.3d 211, 220 [98 Cal.Rptr. 409]; *People* v. *Quinlan,* 8 Cal.App.3d 1063, 1070 [88 Cal.Rptr. 125].)

Trial counsel's failure to bring all of the pertinent factors to the court's attention, to supply the court with articles of the pretrial news coverage or transcripts of radio broadcasts and television telecasts or opinion polls, or to request judicial restriction on the dissemination of prejudicial information through statements of attorneys, law enforcement officers, or court personnel, was a grave omission; the omission may have deprived defendant of his constitutional right to have his trial held in a neutral forum. Because the question as to whether defendant received effective representation of counsel forms the basis for his petition for a writ of habeas corpus, the newspaper coverage, if not part of the record on appeal, is properly before us in the habeas corpus proceeding.[2]

The Attorney General's argument that the prejudicial effect of the news coverage was largely dissipated by the time of trial is untenable. The crime was committed on January 27, 1970, and the trial commenced less than three months later. In *Griffin* v. *Superior Court,* 26 Cal.App.3d 672, 680-681 [103 Cal.Rptr. 379], this court stated: "Stanislaus County has been judicially recognized as not being of such size as to disregard or be indifferent to a barrage of publicity detailing a serious crime. (*Fain* v. *Superior Court, supra,* 2 Cal.3d 46.) The size of the area and population of Kern County and Bakersfield, which are considerably larger than Stanislaus County and Modesto, has been held to be inadequate to sufficiently dissipate the impact of adverse publicity surrounding a criminal trial (*Lansdown* v. *Superior Court, supra,* 10 Cal.App.3d 604, 609 [89 Cal.Rptr. 154]). In *Corona* v. *Superior Court, supra,* 24 Cal.App.3d 872, at page 883

---

[2]While we do not reach the question, we are not convinced that the pretrial news coverage was not considered by the trial judge. The judge displayed a thorough knowledge of the principles upon which he was to be guided in ruling on defendant's motion for a change of venue. It stands to reason that his statement that his ruling was based on his "own evaluation of the nature, frequency and timing of the matter involved in this case" must have included some of the news coverage. It would be strange indeed to hold, categorically, that in making our own independent evaluation as to whether a change of venue should have been granted in a particular case, we are precluded from considering material the trial court obviously must have considered. (See Evid. Code § 459; *People* v. *Tossetti,* 107 Cal.App. 7, 12 [289 P. 881].)

[101 Cal.Rptr. 411], with respect to the population factor, the court wisely stated: 'At this point community population becomes a factor. The potential of community bias mounts in direct ratio to the pervasiveness of publicity. Delay may counteract publicity in medium-size and larger cities, but in small communities, where a major crime becomes embedded in the public consciousness, the effectiveness of delay is diminished.' "

Lastly, the actualities of the voir dire do not help the Attorney General's position. The jury panel from which the first jury was selected consisted of 41 prospective jurors; only three had not read or heard about the case, and of those three, two were hospitalized during the period of the publicity; of the remaining 38, all admitted that they had heard and read about the case, and seven said they had formulated opinions. While 31 jurors declared that they had formed no opinion, it is now settled that a juror's declaration regarding his ability to act impartially is no longer controlling. (*People* v. *Sirhan,* 7 Cal.3d 710, 731 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People* v. *Tidwell, supra,* 3 Cal.3d 62, 73.) As Mr. Justice Friedman observed in *Corona* v. *Superior Court,* 24 Cal.App.3d 872, 878-879 [101 Cal.Rptr. 411]: "The goal of a fair trial in the locality of the crime is practically unattainable when the jury panel has been bathed in streams of circumstantial incrimination flowing from the news media. Questioned on *voir dire* as to the effect of the media's evidentiary disclosures, one prospective juror may deny or admit awareness, another disclaim or admit prejudgment. One may falsely deny both knowledge and prejudice for the sake of a place on the jury. An honest juror may admit knowledge or tentative prejudgment and find himself excluded. Many will sincerely try to set aside their preconceptions and give assurance of impartiality, yet unconsciously bend to the influence of initial impressions gained from the news media."

We consider next defendant's contention that he was denied effective representation of counsel because the public defender did not explore the defense of diminished capacity and because the trial judge failed to inquire into defendant's reasons for requesting a substitution of attorneys.

On the first day of trial, defendant moved the court for a substitution of attorneys. The following transpired:

"THE DEFENDANT: Could I address the Court for a moment, please?

"THE COURT: Yes, sir.

"THE DEFENDANT: There seems to be a conflict of interest between the Public Defender's Office and me and I believe and I would like to have

another attorney appointed me, if possible, because I have asked the Public Defender's Office to subpoena my medical records from the past institutions and he's informed me that he can't do so, that all he can do is write and that it wouldn't do any good any way. And I feel that due to the fact that I have an insanity plea in here that my psychiatric records from my past institutions would have some bearing on this case. I feel that I, I feel that due to I'm facing a capital crime by being tried for Murder One that I should have the best possible defense that the County could give me. And I know that you don't, there is no law that compels the Court to assign a particular person but I would like to ask for Jack Lamb to be assigned to my case.

"THE COURT: Mr. —

"THE DEFENDANT: I do definitely want an attorney that, the Public Defender's Office relieved from my defense.

"THE COURT: Your motion in that respect will be denied.

"I might say, for the record, that it has been my opportunity to observe the Public Defender in the defense of criminal cases. He at all times has demonstrated his competency, his ability to defend, and in fact he presents as adequate and as competent a defense as money could buy.

"Now, we have the matter of the several counts of the Indictment.

"Incidentally, as evidence of that some eighteen [*sic*] counts of the Indictment were dismissed on a 995 Motion made in your behalf by the Public Defender.

"THE DEFENDANT: Your Honor, when your Defense Counsel advises you that it would be embarrassing to him to stand up and argue a point in defense, in your defense, pertaining to an insanity plea where there are definite grounds in prior institution records, when he informs you that this would embarrass him for arguing these points because he feels that there is no merit to these points, do you feel that he is giving me an adequate, the best adequate defense that I could have in this?

"THE COURT: *I have no way of knowing what transpired as between yourself and Mr. Hancock, the Public Defender*—(Italics added)

"THE DEFENDANT: Well, this is what has happened.

"THE COURT: —in your prior consultations, I do know that, obviously, you make a very intelligent and knowledgeable representation in your own behalf.

"Now, you have the reports of the alienists. Now, this does not mean that you may not challenge the reports of the alienists and I'm sure that Mr. Hancock will assert every possible defense in your behalf.

"Your request for selection of your own counsel has already been passed upon and it is denied.

"THE DEFENDANT: Well, would you deny me another counsel, to be able to appoint me some other counsel, then?

"THE COURT: I said it was denied and I renew and say again, it is denied."

Later, on the first day of the sanity phase of the trial, the public defender, out of the presence of the jury, informed the court that defendant wished to move for a continuance. The following discussion took place:

"MR. HANCOCK: Yes, Your Honor, at this time, upon the request of the Defendant, I would move for a continuance of this insanity trial for a period of one week. Mr. Miller has requested that I do this in order that he may obtain some evidence which he tells me he has someone working on at this time. *I have no knowledge of this as a matter of fact myself. I, so far as I am concerned I have researched the law and he, so far as the plea of 'Not guilty by reason of insanity' is concerned, I know of nothing else that could be accomplished through this continuance.* But it is at the request of the Defendant that I make that.

"THE COURT: Is there an offer of proof to be made in support of this?

"MR. HANCOCK: I have nothing in this line, Your Honor.

"THE COURT: Yes, sir?

"THE DEFENDANT: I was contacted last night by, by an investigator and I have been writing a number of letters trying to, trying to get some help to get some records subpoenaed and one thing and another and also some personal private investigation. And I wrote this letter to this particular person over two weeks ago, but I didn't, he was unable to get here until last night. And he had, he had to wait in the office until pretty late. I talked to Captain Brooks before he got in to see me. He's from Fresno. And he indicated to me that he would, he would try to help me and that he would,

he would do the investigating that I requested free, gratis, because I told him I had no money. And he said that he would do this part. And he also has an attorney in mind that has had considerable dealings with insanity pleas. And so he said—

"THE COURT: Well, again—excuse me. Go ahead.

"THE DEFENDANT: He said it was so late that he didn't know whether he could get an extension, but he advised me to ask the Court for an extension so he would have time to do so.

"THE COURT: Well, as I suggested earlier, I would require an offer of proof of the substance, the content of that which you feel would be in support of the plea of 'Not guilty by reason of insanity.'

"May I say, we are concerned with the question of whether you had the mental capacity and knew right from wrong on January 28th—27th, was it?

"MR. WOLFE: January 27th, Your Honor.

"THE COURT: —1970. Having that in mind, I'll hear you with regard to the content. What would you intend to prove by other evidence?

"THE DEFENDANT: I believe that my last record, the 16 years that I did in Oregon State Penitentiary [*sic*] just before I come in here would show that over a period of better than six years *I was considered to be a psychopathic hypermanic personality as well as a lot of other things that I don't know about. I mean I don't know the meaning of the words. That— and all of these things were written up by the penitentiary psychologists.* However, the record is not a certified copy. And before it could be accepted I assume it would have to be certified or the psychiatrist that wrote it would have to be subpoenaed.

"I also was locked up in a, what they call an isolation building, segregation building for five years and eight months out of six years and completely away from the yard. And in that period of time, in that five years and eight months that I was in there there was no less than six men committed suicide in the very section where I was at.

"I was considered, along with this I guess I was considered an escape risk because there was, I did not personally have access to my records. But I know, I knew that the reports that went in on me weren't, weren't too good. And I was called in and advised that they were contemplating having me upon the completion of my time in prison, they were con-

templating having me committed to the State Institution because I wasn't ready to be released. And I did all of my time. I did my, flattened my time. I did—I had a 25 year sentence. 16 years and eight months does that sentence. I did 16 years of it and I was allowed eight months regular industry time, which you get from the various jobs that you do.

*"And I, I feel that that, merely a 45 minute or an hour's oral summary by a psychiatrist is not sufficient to determine my sanity or insanity. I think that in some fields I'm perfectly normal. But I believe in others I—I have personally requested, long before this, for psychiatric help in prison. And I have been informed by a number of people, psychiatrists, that I, that I was on the fringes in certain areas. And I would like—this is what I have asked Mr. Hancock to—I gave him the name of some people. I asked him to subpoena those people. He informed me that he didn't think that it would be allowed or he didn't think that it would do any good. But I feel that it would. I feel that it would help me, that it would be a defense.*

"THE COURT: Well, now, in connection with the offer of proof that I asked you to make which would have to be shown in order to justify a continuance, you referred to some records from a prison in Oregon.

"THE DEFENDANT: Where I just came out of.

"THE COURT: And you also suggested that because they were not certified they would not be receivable in evidence.

"THE DEFENDANT: He has some of them here, but they're not certified. This investigator—

"THE COURT: Just a moment.

"Mr. Wolfe, would you waive any irregularity with regard to the certification or authentication of such records?

"MR. WOLFE: Yes, I would, Your Honor.

"THE COURT: You would have no objection to their being received in evidence?

"MR. WOLFE: I would have no objection and I would further stipulate that they could go in on behalf of the Defendant.

"MR. HANCOCK: Your Honor—

"MR. WOLFE: And any other prison records, as far as that goes.

"THE DEFENDANT: *I think that in addition to this verification from a psychiatrist, I mean an extension of this—in my records it says very little about the time that I did in isolation in the hole, what they call the hole.* It merely says an extended time in the prison segregation building. That's all the reference it has. And I believe that with a little more time that I can get, I can get verification and proof of the fact through the people, the men that were living right down there with me that committed suicide under those same conditions. I can also—*it doesn't say anything in my record about beatings I took in there where I ended up with a brain concussion, laid in the hospital. It merely has a reference to 14 days in the hospital where it doesn't say a thing why I was there or anything else in this record. But I can get people subpoenaed with this investigator who would testify to this.*

"THE COURT: Well, when we get all through with whatever you say occurred in the Oregon Prison the fact is that you were released into society by the authorities there. Isn't that correct?

"THE DEFENDANT: I would say so, yes. I got out, anyway.

"THE COURT: You were released?

"THE DEFENDANT: Yes.

"THE COURT: Without any supervision?

"THE DEFENDANT: I was released, but I had help, people helped me getting me out.

"THE COURT: But you were not released under any supervision or control—

"THE DEFENDANT: No, no, sir.

"THE COURT: —no parole?

"Your motion is denied. (Italics added)"

The *M'Naughten* rule is still viable in this state on the issue of whether the defendant was insane when the crime charged was committed. But it is now settled that as to crimes in which specific intent, or premeditation, or malice, is an essential element, the defendant's diminished capacity, brought about by mental or emotional abnormalities, is a defense which may be used during the guilt phase of the trial to negate the requisite specific intent, premeditation or malice. (*People* v. *Wells,* 33 Cal.2d 330

[202 P.2d 53]; *People* v. *Gorshen*, 51 Cal.2d 716 [336 P.2d 492]; *People* v. *Conley*, 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911]; Diamond, *Criminal Responsibility of the Mentally Ill* (1961) 14 Stan. L.Rev. 59.) This defense, known as the *Wells-Gorshen* rule, embraces the viewpoint that a person may commit a serious crime such as robbery and murder, not with malice or because he really wants to steal or to take human life but because he is impelled to do so by irrepressible and emotional impulses brought about by mental aberrations; just as the People must prove the existence of intent or premeditation or malice, so must the defendant be allowed to disprove them. In *People* v. *Gorshen, supra,* for example, the defendant was accused of murder, and the Supreme Court recognized the propriety of the trial judge's considering the testimony of a qualified psychiatrist, that defendant was suffering from an uncontrollable compulsion, the consequence of mental disease. A few years later the court in *People* v. *Conley, supra,* page 318, stated: "A person who intentionally kills may be incapable of harboring malice aforethought because of a mental disease, defect, or intoxication, and in such case his killing, unless justified or excused, is voluntary manslaughter."

Defendant was convicted of felony murder based on robbery, a specific intent crime, assault to commit murder, grand theft of a firearm and auto theft, all specific intent crimes, and it should have been obvious to his trial counsel from the very beginning that if defendant had any defense at all to these offenses, the defense was diminished capacity; the evidence on the issue of guilt was decisive, and the psychiatric reports of the court-appointed psychiatrists were all to the effect that defendant was sane at the time of the commission of the offenses under the California version of the *M'Naughten* rule. There were, however, strong indications that defendant may have been the victim of mental disease caused by long imprisonment, solitary confinement, beatings and abnormal environment. Defendant had spent 26 years of his life in penal institutions and reform schools; he said he had been beaten many times and on one occasion had suffered a concussion, requiring hospitalization; he also said that during his tenure in the Oregon Penitentiary he was isolated for about five years and eight months, and during that period several similarly treated inmates had committed suicide. Defendant was given psychiatric examinations by the prison authorities, and he was told that he was "a psychopathic, hypermanic personality as well as a lot of other things I don't know about."

Dr. Soelling, a court-appointed psychiatrist, expressed the opinion that defendant had developed a "psychopathic personality disturbance, and dysocial reaction" in response to his living in the abnormal environment of reform schools and correctional institutions; the doctor said that defend-

ant had become a person who knew the difference between right and wrong but could not adhere to accepted social behavior.

The public defender ignored defendant's past medical history and, seemingly, ignored also the possibility of presenting evidence on the defense of diminished capacity on the guilt issue; he not only told defendant that it would not do any good to write for his medical records but, later, when defendant asked for a continuance on the sanity phase of the trial, counsel again demonstrated a negative attitude as to the value of defendant's past medical history.[3] It seems clear to us that the defense of diminished capacity was not explored fully by defense counsel and that defendant may have been deprived of a vital defense. (*In re Saunders,* 2 Cal.3d 1033 [88 Cal.Rptr. 633, 472 P.2d 921]; *People* v. *McDowell,* 69 Cal.2d 737 [73 Cal.Rptr. 1, 447 P.2d 97].)

Defendant's contention that he did not receive effective representation by counsel and that he was denied a crucial defense is fortified by the judge's failure to make sufficient inquiry into the merits of defendant's request for a substitution of attorneys. Defendant was aware of the gravity of the charges against him, and he was very much concerned because the public defender had not "subpoenaed" or written for his medical records. Defendant informed the court, in essence, that he was in basic disagreement with his attorney as to the importance of the medical records and that he had been told counsel would be embarrassed to argue certain points in his behalf; defendant expressed the opinion that he was not receiving effective representation by counsel. Despite the reasonableness of defendant's concern, the trial judge did not inquire into trial counsel's reasons for ignoring defendant's past medical history and did not make any attempt to understand the exact nature of the disagreement between the attorney and his client. The judge stated, instead, that he had no way of knowing what had transpired between the defendant and the public defender; he denied the motion on the basis of his own opinion that the public defender was a competent attorney.[4]

---

[3]In arguing against the death penalty, the public defender said: "Maybe Mr. Miller isn't fit to live in society. Maybe he doesn't know how to get along in a free society. I think that's probably true, as is evident from what had happened.

". . . What if, a man who has been in prison since he was eighteen years of age, with the exception of just very less than a year, how would he know how to get along? Don't you think this kind 'of life would leave some kind of impression on him, on the way he lives?' "

[4]See *People* v. *Miller,* 7 Cal.3d 562 [102 Cal.Rptr. 841, 498 P.2d 1089], for the Supreme Court's discussion of the effective representation of counsel issue where the record shows that defense counsel was aware of the diminished capacity defense and did not use it for strategic reasons. In this case trial counsel did not procure

Under somewhat similar circumstances the Supreme Court in *People* v. *Marsden,* 2 Cal.3d 118, 123-125 [84 Cal.Rptr. 156, 465 P.2d 44], had this to say: "A trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys unless he is cognizant of the grounds which prompted the request. The defendant may have knowledge of conduct and events relevant to the diligence and competence of his attorney which are not apparent to the trial judge from observations within the four corners of the courtroom. Indeed, '[w]hen inadequate representation is alleged, the critical factual inquiry ordinarily relates to matters outside the trial record: whether the defendant had a defense which was not presented; whether trial counsel consulted sufficiently with the accused, and adequately investigated the facts and the law; whether the omissions charged to trial counsel resulted from inadequate preparation rather than from unwise choice of trial tactics and strategy.' (*Brubaker* v. *Dickson* (9th Cir. 1962) 310 F.2d 30, 32.) Thus, a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney. A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination.' (*Spector* v. *Superior Court* (1961) 55 Cal.2d 839, 843 [13 Cal.Rptr. 189, 361 P.2d 909].)

". . . . . . . . . . . . . . . .

"Further support for the defendant's contention that it was error to deny his motion without an opportunity for explanation comes from the line of authority beginning with *People* v. *Youders* (1950) 96 Cal.App.2d 562, 569 [215 P.2d 743]. (See, e.g., *People* v. *Monk* (1961) 56 Cal.2d 288, 299 [14 Cal.Rptr. 633, 363 P.2d 865]; *People* v. *Prado* (1961) 190 Cal.App.2d 374, 377 [12 Cal.Rptr. 141]; *People* v. *Hood* (1956) 141 Cal.App.2d 585, 589 [297 P.2d 52].) These cases hold that claims of incompetency of trial counsel must be raised by defendant at trial and generally may not be raised for the first time on appeal. 'If defendant felt his counsel did not adequately represent him he should have complained to the trial court and given that court an opportunity to correct the situation. In the absence of such complaint the acts of defendant's counsel are imputed to him.' (*People* v. *Youders* (1950) *supra,* 96 Cal.App.2d 562, 569.) If a defendant is required to complain of error at trial so that the

---

defendant's past medical history for use in the guilt stage, and because the trial judge did not inquire into his reasons for not doing so, the record does not indicate that defendant's trial counsel was aware of the diminished capacity defense and that he explored that defense and discarded it for strategic reasons.

error can be corrected at that level, he should be given ample opportunity to explain and if possible to document the basis of his contention. A right is vacuous indeed if it must be asserted at trial but may not be supported before the trial judge by more than the bare complaint."

We are reluctant, naturally, to reverse a judgment in a case such as this, where the evidence of guilt is decisive. We are also reluctant to impugn by the slightest suggestion, the integrity of the trial jurors. Most of all, we dislike questioning the competence of defense counsel for we realize that he was working under extremely difficult conditions; he was called upon to defend a man who was accused of the brutal murder of a popular member of the community and, what is worse, the murder victim was counsel's friend and a person he had admired. We cannot be guided by these considerations. This is a classic example of a case in which "fundamental fairness—the touchstone of due process—" requires a new trial. (*Gagnon v. Scarpelli,* 411 U.S. 778, 790 [36 L.Ed.2d 656, 666, 93 S.Ct. 1756].) While the record may not show that the defendant was *actually* deprived of a vital defense, as was true in *People v. Ibarra,* 60 Cal.2d 460 [34 Cal. Rptr. 863, 386 P.2d 487], what it does show is that through the omissions of his counsel defendant may not have received an impartial trial; he was tried in an atmosphere permeated with hostility by the pervasive pretrial publicity. What the record shows also is that through the omissions of court and counsel defendant was denied the right to explore fully the only defense he had. If "effective" counsel required by due process is to have meaning at all, the type of representation contemplated by the Constitution was lacking in this case. (*In re Saunders, supra,* 2 Cal.3d 1033; *Brubaker v. Dickson,* 310 F.2d 30.)

The writ in 5 Criminal No. 1388 is granted and the petitioner is discharged from the custody of the warden at Folsom and committed to the custody of the Sheriff of Stanislaus County for further proceedings in accordance with the views expressed in this opinion.

The judgment in 5 Criminal No. 1398 is reversed.

Brown (G. A.), P. J., and Franson, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied October 24, 1973.