[Crim. No. 1851. Fifth Dist. Mar. 5, 1976.]

THE PEOPLE, Plaintiff and Respondent, v.
THEODORE ADAM MELISSAKIS, Defendant and Appellant.

54

**COUNSEL**

Roderick P. Bushnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Arnold O. Overoye, Willard F. Jones and William G. Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

GARGANO, J.—On July 5, 1973, appellant, Theodore Adam Melissakis, registered at the Kern Hotel in Bakersfield, California, under the nomenclature "Smith"; he paid for one week's occupancy and took up residence in room number 12. The hotel was located across an alley way from a building owned by the Pacific Telephone Company, and room number 12 faced two metal doors which were on the second floor of the telephone building.

On July 12, 1973, appellant paid in advance for another week's occupancy at the hotel, this time using his true name. On the same day appellant went to a gun shop in Bakersfield and purchased a .22 caliber rifle and a box of ammunition; when purchasing the rifle he gave the hotel as his address.

On July 15, 1973, Arthur Jordan, an employee of the Pacific Telephone Company who was working in the telephone building, opened the two metal doors that faced appellant's hotel room. As Jordan did so, appellant shot him in the right shoulder with the rifle he purchased from the gun shop. Then, when Jordan started to close the large double metal doors, appellant fired a second shot at the injured man; this shot ricocheted off the side of one of the doors. About an hour later appellant was arrested in his hotel room by the Bakersfield police.

On July 17, 1973, a criminal complaint was filed in the Municipal Court of the Bakersfield Judicial District accusing appellant of assault with intent to commit murder in violation of section 217 of the Penal Code. During the following week, at the request of defense counsel, proceedings were instituted in the Superior Court of Kern County to inquire into appellant's present sanity. ▆ ▆▆▆ ▆ The court (Judge Paul R. Borton) appointed Dr. Richard Burdick and Dr. Paul Cutting to examine appellant and to determine whether he was capable of understanding the nature of the proceedings being taken against him and to assist his counsel in the preparation of a defense.[1]

On August 6, 1973, Doctors Burdick and Cutting examined appellant and in their reports to the court expressed the opinion that appellant was

---

[1]Effective September 27, 1974, a hearing to determine a defendant's mental competence to stand trial cannot be held until after the information has been filed. (Stats. 1974, ch. 1511 [Pen. Code, § 1368.1, subd. (a)]; see *Hale* v. *Superior Court* (1975) 15 Cal.3d 221 [124 Cal.Rptr. 57, 539 P.2d 817]; *Chambers* v. *Municipal Court* (1974) 43 Cal.App.3d 809 [118 Cal.Rptr. 120].)

able to understand the nature and purpose of the proceedings that were being taken against him and that he was able to cooperate with his defense counsel in a rational manner. On August 10, 1973, the court (Judge Marvin E. Ferguson) stated it had no doubts that appellant presently was sane.

On September 11, 1973, an information was filed in the Superior Court of Kern County charging appellant with assault with a deadly weapon in violation of section 245 of the Penal Code, and with using a firearm during the commission of the offense within the ambit of section 12022.5 of the Penal Code. Appellant entered a plea of not guilty to the charge. Later, at defense counsel's request, the court (Judge John Michael Nairn), over appellant's objection, entered an additional plea of not guilty by reason of insanity. The court also appointed Dr. Richard Burdick and Dr. Paul Cutting as medical examiners and directed them to examine appellant to determine, under the *M'Naughton* test, whether he was sane at the time of the commission of the offense.

On October 26, 1973, the court (Judge Marvin E. Ferguson) ordered Doctors Burdick and Cutting to update their earlier reports on the issue of appellant's present sanity to stand trial. Dr. Burdick reported that he diagnosed no psychiatric disease. But when Dr. Cutting explained that appellant was laboring under a "delusional system" and expressed the opinion that appellant was not capable of trusting another person sufficiently to present an adequate defense, the judge ordered a hearing on the issue of appellant's present sanity and appointed a third psychiatrist, Dr. Francis Matychowiak, to examine appellant and to make a report. Dr. Matychowiak could find no evidence of any significant mental illness and was of the viewpoint that appellant presently was able to understand the nature and purpose of the proceedings being taken against him and to cooperate in a rational manner with his counsel in presenting his defense.

On November 13, 1973, at the hearing on the issue of appellant's present sanity, the court (Judge Ferguson) informed appellant that he was entitled to have the three psychiatrists personally present at the hearing and that his attorney was willing to waive the presence of the psychiatrists and to submit the matter upon the reports of the doctors. The judge also informed appellant that if the presence of the psychiatrists were waived and the matter were referred to the court for a decision on the doctors' reports, he would find appellant presently sane and able to stand trial. Appellant stated that he would be "glad to waive

the hearing," and the court determined that he was sane. The cause proceeded to jury trial.

On the morning of the trial appellant, out of the presence of the jury, made a motion for the appointment of another attorney to defend him. He explained that he was disturbed with his counsel because the attorney was not cooperating with him. After extensively questioning appellant and defense counsel, the court (Judge John D. Jelletich) denied the motion.

On the third day of trial appellant requested the court to subpoena for his defense two issues of Playboy magazine, certain newspaper articles appearing in the San Jose Mercury-Times and various individuals from the San Diego area; he informed the court that he wanted to prove that certain organizations had put him in fear of his life and that this in turn resulted in the incident for which he was standing trial; he also said that he believed that a Women's Liberation organization was involved with the military in conspiring against him. At that point appellant's trial counsel requested the court to reconsider appellant's present sanity and his ability to stand trial. The court denied the request and ordered the trial to continue.

At the close of the prosecution's case in chief, appellant took the stand and, in narrative form, testified in his own behalf. He stated that in the latter part of 1972, while he was attending college in San Diego, he became suspicious that a conspiracy was being perpetrated against him by various organizations for the purpose of threatening, and ultimately injuring, his well being. He believed that some of his friends had joined the conspiracy and secretly gave him some sort of drug or stimulant; his friends also accused him of witnessing a murder at a bar in San Diego. Then people commenced to telephone appellant at his residence and said that they dialed the wrong number in an effort to make him believe that they were going to do him harm; several people came into the store where he was working, and to worry him gave the impression that they were attempting to steal something from the store. On one occasion, when he was walking home late at night, a "scantly dressed" young lady appeared from the bushes and tried to entice him into raping her. Also, when appellant hitchhiked "strange" people gave him rides. On two occasions a repairman from the gas company appeared near his residence, causing appellant to believe that he was under surveillance by narcotics agents or the FBI.

Appellant related that by the end of 1972 he dropped out of school and moved to Fremont, California, to live with his brother. While he was living with his brother television shows and commercials caused him to believe that a military group was following him because they thought he was a security risk; on one show comedian Bob Hope referred to fighter pilots in Vietnam in such a way that it indicated that military intelligence knew that appellant wanted to join an antiwar movement; on another show, during a commercial, Julie Nixon Eisenhower presented herself in such a manner as to suggest that appellant was being followed by someone from military intelligence. Appellant said that he made several airplane trips back to San Diego, and on one of those trips he got the impression that secret agents had him under observation; a man sitting across the aisle from him wrote symbols on a note pad similar to the symbols appellant made when he was working as a cryptographer in the Navy; in addition, a group in the airplane tried to give him the impression that they were disabled veterans.

Appellant added that during the period that he was living in Fremont, he went to see a movie about the life of a Cuban revolutionary hero. Afterward, he saw people on the street making gestures similar to the hand gestures made by the actors in the movie. At one point appellant noted that his own brother, a career Navy man, was watching him in order to study appellant's reaction to the hand gestures; as a consequence, appellant moved out of his brother's house and commenced living in an apartment in Sunnyvale, California.

While in Sunnyvale appellant realized that the programs on television were "really getting wild" and that the members of the conspiracy were following him constantly in an attempt to frighten him. Once when he was watching a televised program of American war prisoners returning from Vietnam, he noted that a prisoner's wife resembled the girl that lived near him in San Diego in an upstairs apartment; appellant began to think that the military or some of its supporters were attempting to frighten him because of his antiwar thinking; appellant decided to hitchhike to Fresno in order to elude them.

Appellant testified that he remained in Fresno for a few days and then hitchhiked his way to Bakersfield; he registered at the Kern Hotel under the fictitious name of "Smith." Later, appellant heard comments from waitresses in restaurants where he ate, leading him to believe that a Women's Liberation organization was part of the conspiracy against him; he said that women would come into the restaurants where he ate

and position themselves so that he would have to notice them. After a while the harassment became constant, and when appellant walked down the street even policemen gave him strange looks; when it became impossible for appellant to leave his hotel room, he purchased the rifle and ammunition to protect himself. He saw the metal doors on the telephone building open and close on two or three occasions; he also saw workmen at the telephone building staring at him. Believing that the workmen were members of the conspiracy and that the conspiracy was attempting to put him into a position where he could not defend himself from physical attack, appellant shot the person standing in the open doorway.

At the close of the guilt phase of the trial, the jurors returned a verdict finding appellant guilty of assault with a deadly weapon as charged in the information; they also found that appellant used a firearm during the commission of the offense. Then at the hearing on the issue of appellant's sanity under the *M'Naughton* test, Doctors Richard Burdick and Francis Matychowiak, testifying on behalf of the People, recanted their earlier beliefs that appellant had no discernable psychiatric problem and said that he honestly believed in the existence of the conspiracy and that he was suffering from a severe mental illness of the schizophrenia paranoid type; however, they were of the opinion that appellant understood the difference between right and wrong and that he was sane under the *M'Naughton* test. Dr. Paul Cutting testified on behalf of appellant; he said that he believed that appellant was suffering, severely, from paranoid schizophrenia and opined that because of his preoccupation with the existence of a conspiracy, appellant was incapacitated from knowing and understanding the wrongfulness of his acts.

At the close of the sanity phase of the trial, the jury found appellant sane at the time of the commission of the offense. Appellant was sentenced to state prison for the term prescribed by law, and he appeals from the judgment. ▮ He contends, among other things, that the judge did not comply with the mandate of section 1368 of the Penal Code when during the trial it became apparent that appellant may have been incapable of understanding the nature of the proceeding in which he was involved or unable to cooperate with his counsel in the preparation and presentation of a rational defense. At the time of trial section 1368 read as follows: "If at any time during the pendency of an action and prior to judgment a doubt arises as to the sanity of the defendant, the court must order the question as to his sanity to be determined by a trial by the court without a jury, or with a jury, if a trial

by jury is demanded; and, from the time of such order, all proceedings in the criminal prosecution shall be suspended until the question of the sanity of the defendant has been determined, and the trial jury in the criminal prosecution may be discharged, or retained, according to the discretion of the court until the determination of the issue of insanity."

■ The question as to whether appellant was sane to stand trial was presented, fully, to the superior court at the pretrial hearing on appellant's present sanity and was resolved by the court on the basis of psychiatric reports prepared by two competent psychiatrists; the pretrial decision, therefore, was supported by substantial evidence. (See *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 288 [61 Cal.Rptr. 644, 431 P.2d 228].) Nevertheless, we reverse the judgment. When Judge Ferguson found that appellant was presently sane, there was also substantial evidence to support the contrary conclusion,[2] and the factors which came to light at the commencement of, and during, the trial completely undermined the medical opinions upon which the present sanity finding was predicated.

■ On the morning of the trial, appellant asked for a substitution of attorneys, explaining that he was disturbed with his counsel because the attorney was not cooperating with him; this request was consistent with Dr. Cutting's opinion that appellant was not capable of trusting another person sufficiently to present an adequate defense.

Then, on the third day of trial, appellant made a bizarre request which, per se, should have triggered a suspicion in the judge's mind as to appellant's present sanity; he asked the judge to subpoena two issues of Playboy magazine, several newspaper articles and various individuals and organizations, including a Women's Liberation organization, so that he could prove that there was a conspiracy against him. It was this bizarre request which prompted appellant's trial counsel to make a motion for the reconsideration of the present sanity issue.

After counsel's motion for a second sanity hearing was denied, appellant took the stand and testified in his own behalf. His pathetic testimony vividly demonstrated that he was suffering from a serious mental illness and that the mental illness gave birth to a delusion of the kind that could have made it impossible for appellant to understand,

[2]Dr. Cutting's opinion, by itself, constituted substantial evidence of present insanity. (*People* v. *Pennington* (1967) 66 Cal.2d 508, 519 [58 Cal.Rptr. 374, 426 P.2d 942]; see also *People* v. *Beivelman* (1968) 70 Cal.2d 60, 71, 73 [73 Cal.Rptr. 521, 447 P.2d 913].)

fully, his predicament and to assist his trial counsel in presenting a rational defense.

During the sanity phase of the trial, all of the doctors agreed that appellant had a serious mental illness and that he honestly believed in the conspiracy he described; Doctors Burdick and Matychowiak explained that they did not realize until after hearing appellant's testimony during the guilt phase of the trial that appellant was suffering from a mental illness. Up to that time appellant had refused to comment upon any of the events leading up to or surrounding the shooting, including his belief in the conspiracy.[3]

To recapitulate, the trial judge, by the commencement of the trial, had read the pretrial psychiatric reports and he knew that the two doctors who were of the opinion that appellant had the mental capacity to stand trial believed, at the time they made their reports, that appellant was not suffering from any significant mental illness. He also knew that one doctor, Dr. Cutting, believed that as a result of a "delusional system" appellant was incapable of trusting any person sufficiently to present an adequate defense. Later, during the trial, the judge discovered for himself that appellant was engulfed by an insane delusion of substantial magnitude and that there was validity to Dr. Cutting's opinion. In addition, he discovered that the doctors who had expressed the opinions that appellant had the mental capacity to stand trial learned for the first time at the guilt phase of the trial that appellant had a serious mental illness and that he suffered from an insane delusion. It seems clear that the trial judge should have made further inquiry into the present sanity issue, if not during the trial, then at least prior to the imposition of sentence.

■ It is fundamental that a defendant who has been convicted of a criminal offense cannot be sentenced if at the time of sentencing there is good reason to believe that he does not understand the nature of the proceedings or is unable to cooperate with his counsel. (Pen. Code, § 1367.) It is also fundamental that the sentencing judge may not escape his own responsibility to determine whether there is just cause for withholding imposition of sentence by relying solely upon a pretrial decision or pretrial psychiatric reports, particularly where, as here, it should have been obvious that there was a material change of circumstances. (See *People* v. *Pennington, supra,* 66 Cal.2d 508, 520.)

[3]Unfortunately, the expert witnesses were not asked whether the newly acquired information would have affected their earlier opinions concerning appellant's ability to understand the nature of the proceedings and to cooperate with his counsel.

In reversing the judgment, we do not mean to suggest that the issue of present sanity cannot be resolved at a hearing prior to trial. Nor do we suggest that after a full pretrial hearing on the issue of present sanity the judge presiding at a defendant's trial may not rely at all upon a pretrial decision finding a defendant to be "presently" sane in disposing of any subsequent motion for a further inquiry where the motion is not predicated upon a change of circumstances or new evidence. ■ However, section 1368 of the Penal Code imposes upon the trial judge the duty, on his own motion, to inquire into the mental capacity of a defendant to stand trial whenever evidence presented during the trial *or prior to sentencing* raises a doubt in this respect. (*People* v. *Coogler* (1969) 71 Cal.2d 153, 168, fn. 7 [77 Cal.Rptr. 790, 454 P.2d 686]; *People* v. *Pennington, supra,* 66 Cal.2d 508, 520.) Consequently, a trial judge may not avoid his own responsibility to make proper inquiry regarding a defendant's capacity to stand trial or to understand the nature of the sentencing procedure by relying solely upon a pretrial decision or pretrial psychiatric reports where, during the trial or prior to the sentencing, he is presented with a substantial change of circumstances or with new evidence which casts a serious doubt upon the validity of the pretrial finding of present sanity. (Cf. *People* v. *Munoz* (1974) 41 Cal.App.3d 62, 66 [115 Cal.Rptr. 726]; *In re Miller* (1973) 33 Cal.App.3d 1005, 1021 [109 Cal.Rptr. 648]; *People* v. *Groce* (1971) 18 Cal.App.3d 292, 296-297 [95 Cal.Rptr. 688].)

■ The dissenting opinion implies that we have second guessed the trial judge in contravention of well established appellate principles. We do not agree. If the trial judge had conducted a hearing on the present sanity issue, and on the basis of medical testimony or other evidence presented at the hearing had determined that appellant presently was sane, we would not have disturbed his decision. Here the trial judge made no inquiry of any kind into appellant's mental capacity to stand trial or to understand the sentencing procedure, despite the fact that there were ample reasons, in addition to appellant's bizarre testimony, for renewing the inquiry. For example, even the doctors who testified for the People admitted that they were not aware that appellant had any significant mental illness or that he was suffering from an insane delusion until they heard him testify; yet, they were not asked whether the newly gained information had any effect on their earlier opinions that appellant was able to understand the proceedings in which he was involved and to cooperate with his counsel in the presentation of a rational defense. It is this failure to perform an important judicial function, not what may have resulted from a second hearing, that mandates the reversal.

We do not find it necessary to reach appellant's remaining contentions.

The judgment is reversed.

Franson, J., concurred.

**BROWN (G. A.), P. J.**—I dissent.

The chronology of events shows that: (1) On November 13, 1973, after a full pretrial hearing on the issue of present sanity at which the reports of three court-appointed psychiatrists were considered, a pretrial judge found appellant presently sane and able to proceed to trial. The majority opinion raises no issue concerning the propriety of this ruling nor the adequacy of the evidence to support it. (2) At the close of the prosecution's case on November 21, 1973, defense counsel made an *in camera* request that the trial judge reconsider appellant's present sanity. The record indicates that prior to counsel's request appellant had asked the court to subpoena the documents and witnesses referred to in the majority opinion. The court denied the request to reopen the sanity hearing and, in doing so, did not rely exclusively upon the prior psychiatric reports but expressly stated that the court had observed appellant during the trial. (3) During appellant's defense case he testified as set forth in the majority opinion.

The majority raises no issue regarding the pretrial ruling nor, indeed, as to the ruling denying the request to reopen made before appellant took the witness stand. The reversal therefore is predicated upon the judge's failure to declare a doubt *sua sponte* grounded upon appellant's testimony during his defense. This necessarily involves a determination by this court that such testimony is sufficient as a matter of law to require that the trial judge should have entertained a doubt as to appellant's present sanity and ordered a full hearing. No other case has purported to hold that such a slim showing constitutes, as a matter of law, substantial evidence requiring the trial judge to declare a doubt. It appears to be directly contrary to the holding in the leading case of *People* v. *Laudermilk* (1967) 67 Cal.2d 272, 285 [61 Cal.Rptr. 644, 431 P.2d 228], which stated: "An examination of decisions falling into the second category leaves us with the conviction that even under the substantial evidence test of *Pate* [*Pate* v. *Robinson* (1966) 383 U.S. 375 (15 L.Ed.2d 815, 86 S.Ct. 836)] and *Pennington* [*People* v. *Pennington* (1967) 66 Cal.2d 508 (58 Cal.Rptr. 374, 426 P.2d 942)] more is required to raise a doubt than mere bizzare actions [citation] or bizarre statements [citation] or

statements of defense counsel that defendant is incapable of cooperating in his defense [citation] or psychiatric testimony that defendant is immature, dangerous, psychopathic, or homicidal or such diagnosis with little reference to defendant's ability to assist in his own defense [citation]." (See also *People* v. *Bryant* (1968) 264 Cal.App.2d 901 [71 Cal.Rptr. 117].)

In *People* v. *Pennington* (1967) 66 Cal.2d 508 [58 Cal.Rptr. 374, 426 P.2d 942], substantial evidence of lack of present sanity was found in an opinion of a clinical psychologist supported by ". . . a previous diagnosis of schizophrenia and paranoia, a current diagnosis of a more paranoid condition, defendant's current unfeigned hallucinations, and defendant's fits of psychotic furor . . . in the courthouse and during the trial; . . ." (*Pennington,* as characterized in *People* v. *Laudermilk, supra,* 67 Cal.2d at p. 283.)

In *People* v. *Humphrey* (1975) 45 Cal.App.3d 32 [119 Cal.Rptr. 74], the record showed that the defendant had been committed several times to mental institutions, he was hallucinating and acting in response to his hallucinations, he was unable to cooperate in psychological testing, he suffered from delusions of persecution, he had loss of memory, and he was diagnosed as a paranoid schizophrenic requiring treatment in a closed setting.

In my opinion, the majority decision injects a doubt in the mind of the trial judge who, being familiar with his duty under the law, had no doubt. It establishes an intolerable *sua sponte* burden upon a trial judge, and the decision is not consonant with prior directives or decisions.

The majority also relies upon the fact that the psychiatrists, who heard appellant's direct testimony during the guilt phase of the trial in preparation for their testimony during the sanity phase, testified during the sanity phase that they had not been fully aware of the extent of appellant's delusional condition until they heard his testimony. However, it is noted that such knowledge did not change their opinions as to appellant's sanity under the *M'Naughton* test. The majority, however, speculates that that knowledge would change the psychiatrists' opinions as to appellant's sanity under Penal Code section 1368. I would agree that if that change in opinion appeared in the record, a reversal would be justified. However, there is nothing in the record to support that conclusion. A reversal, therefore, is in part based upon pure speculation. If, having heard that testimony, it did in fact change the psychiatrists'

opinions with respect to the present sanity issue, the matter should be raised by a petition for writ of habeas corpus, in which case this court would not be basing its decision on guesswork.

Respondent's petition for a hearing by the Supreme Court was denied April 28, 1976.