Filed 11/4/13  P. v. Hill CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B243919 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA078617) |
| v. | |
| TONY LEE HILL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Steven R. Van Sicklen, Judge.  Affirmed.

Michele A. Douglass, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Lawrence M. Daniels and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

A jury convicted defendant Tony Lee Hill of second degree robbery (Pen. Code, § 211)[1] and found true allegations that defendant had suffered nine prior convictions of serious or violent felonies or juvenile adjudications (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and had served one prior prison term (§ 667.5, subd. (b)).  The trial court sentenced defendant to 25 years to life in state prison, striking the prior prison term allegation.

During the course of the proceedings, the trial court declared a doubt as to defendant's competence to stand trial (§ 1368), pursuant to defense counsel's request. After reviewing psychiatric evaluations of defendant, it concluded he was competent. Thereafter, defense counsel repeatedly declared a doubt as to defendant's competence but the trial court refused to hold a second competency hearing.  On appeal, defendant argues this constituted reversible error.

In addition, defendant requested pro. per. status on the day trial commenced.  The trial court denied that request as untimely.  Defendant argues on appeal that the trial court erred in finding the request untimely because defendant did not request a continuance.

We disagree with both contentions raised by defendant and therefore affirm the judgment.  In addition, we have reviewed at defendant's request the sealed transcript of the trial court proceedings on his *Pitchess*[2] motion to determine whether the trial court failed to provide him with all discoverable information.  We find no error in the trial court's handling of those proceedings.

---

[1]     All further undesignated statutory references are to the Penal Code.

[2]     *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

# FACTUAL BACKGROUND

We only briefly recount the facts underlying the offense at issue because the details are not relevant to the issues on appeal. On July 14, 2010, defendant went into a convenience store wearing a mask and pointing his finger inside his shirt to mimic a gun, and told the clerk, Muzzamil Syed, "it's a robbery." When Syed objected, defendant pulled off the mask and said he was kidding. On July 16, 2010, defendant returned to the store and again simulated holding a gun under his shirt. Syed told defendant to leave, but defendant said he was really going to rob him and cut the telephone cord. Syed used his cell phone to call the police. Defendant pushed Syed and left with the cash register, driving away in a black truck. The store's surveillance camera recorded these events.

Officers from the Torrance Police Department responded to the scene. They spotted defendant in his black truck nearby and followed him. Defendant pulled over, but after additional units arrived he sped away, pursued by the police. He drove erratically then crashed into a stop sign. Defendant ran from the scene but was soon apprehended. He yelled, said he was sorry, and looked tired.

Defendant was placed in a patrol car. He said, "I did it. I'm going to jail for the rest of my life." The police officer turned on a recording device and recorded defendant confessing to the crime. After returning to defendant's truck, the officer removed defendant from the car to be viewed by Syed, who had been brought to the scene. Defendant said, "Why do this? I'm telling you I did it." Syed identified defendant and his truck. The cash register was recovered from defendant's truck. Defendant did not appear to be under the influence of drugs.

Defendant testified that on both July 14, 2010, and July 16, 2010, he was under the influence of drugs. He knew what he was doing was wrong but he could not control himself. He said he had been addicted to crack cocaine for three and one-half months prior to the offense.

Dr. Rodica Predescu, a substance abuse expert, said cocaine affects a person for about 15 minutes to an hour, initially making them feel euphoria, sometimes followed by

3

deep depression and self-destructive behavior.  After listening to the audiotape of defendant's police interview, Dr. Predescu opined defendant sounded more depressed than high on cocaine.  She did not know whether defendant had ingested cocaine that night.

## PROCEDURAL BACKGROUND

At the arraignment on September 2, 2010, the court asked defense counsel if he was declaring a doubt as to defendant's competence.  Counsel was not ready to do so but had begun the process of having an expert appointed to examine defendant.  A *Marsden*[3] hearing followed in which defendant complained the public defender had not come to see him or kept him informed.  Counsel explained he had told defendant at the preliminary hearing he wanted to appoint a psychiatrist to evaluate him for competency and regarding issues relevant to his defense.  The court denied the motion to replace counsel.

On September 28, 2010, defendant again complained about counsel, telling the court that everything his attorney said was a lie and that he wanted to file charges against him for obstruction of justice.  Defendant's *Marsden* motion was denied, although a new public defender would be appointed because the prior one was leaving the office.

On December 15, 2010, another *Marsden* hearing was held.  Defendant told the court a 350-pound police officer who assaulted him had been present in the courtroom during defendant's last appearance, and sat at the counsel table with his back to defendant.  He believed his counsel knew the officer would be in court but failed to tell him.  Defendant told the court he had filed documents with the Court of Appeal and the FBI alleging discrimination and racism, and an internal affairs complaint as well as a civil action against the police officers who arrested him.

---

[3]     *People v. Marsden* (1970) 2 Cal.3d 118.

4

## I.        The Initial Competency Hearing

The court held another *Marsden* hearing at defendant's behest on January 25, 2011.  He told the court he had filed habeas corpus writs with this court and had contacted the United States Attorney General regarding his case.  The court denied the request.  On that same date, defense counsel declared a doubt as to defendant's competence.  The court agreed and suspended the criminal proceedings.  The court appointed Dr. Douglas Allen for the defense and Dr. Suzanne Dupee for the prosecution to examine defendant and report on his competency.

Dr. Allen reported on March 15, 2011, that defendant was not competent, based on his inability to rationally assist in his defense.  He believed defendant might suffer from a mood disorder, possibly bipolar disorder with psychotic features, and that this interfered with his reasoning abilities.  Defendant demonstrated paranoid delusional thinking.  Dr. Allen felt defendant could be stabilized in a structured mental health facility with the use of psychotropic medication.

Dr. Dupee reported on March 16, 2011, that defendant was competent to stand trial.  She found him to be pleasant, polite, and cooperative.  His speech was normal in rate and rhythm, and he established a good rapport with her.  His thoughts were linear, logical, and goal-directed.  She found no evidence of psychosis, mania, or depressive, anxious, obsessive, or compulsive symptoms.  His insight and judgment were good, and he was grossly cognitively intact.

The court appointed a third psychiatrist, Dr. Ronald Markman.  Dr. Markman reported that he found defendant competent to stand trial and "has the capacity to cooperate with counsel in a rational manner in his defense, if he chooses to do so."  Defendant was cooperative and responsive, oriented and alert, and gave relevant and coherent responses.  His memory and concentration were unimpaired, and his affect was appropriate.  His judgment was adequate, although he possessed limited insight into his situation.  He found no evidence of psychosis or thought disorder.  He believed defendant suffered from antisocial personality disorder and cocaine dependence.  Dr. Markman

recommended outpatient treatment with a psychiatrist to deal with underlying psychiatric issues and a 12-step substance abuse program.

The matter was heard on April 21, 2011. Having considered the three reports, the trial court found defendant competent to stand trial and reinstated criminal proceedings.[4]

A sixth *Marsden* hearing took place on June 2, 2011. Defendant said his attorney was not bringing the relevant facts of his case to light and argued he should not be charged with robbery, essentially saying he took money from the business, not from the cashier. Defense counsel explained defendant was attempting to file a lawsuit against the Torrance Police Department arising out of their mistreatment of him in this case, which could support a motion for change of venue. She said she had discussed the nature of the robbery charge with him. The trial court denied defendant's *Marsden* motion.

Defendant, represented by a new public defender, brought a seventh unsuccessful *Marsden* motion on July 25, 2011. He said he could not trust his attorney, who was conspiring with the prosecutor and the court due to racism and to protect the four arresting officers who had assaulted him. He stated in some detail the names of the arresting officers and what transpired when he was arrested, again argued the facts of the case did not support robbery, and objected to counsel's handling of his *Pitchess* motion. He believed the jury was going to be paid to convict him. He said he had contacted the Court of Appeal, the Commission on Judicial Performance, the State Bar, the Department of Justice, and the FBI to help him.

On August 10, 2011, defendant brought his eighth unsuccessful *Marsden* motion. He told the court his attorney had intentionally started an argument with him during a video conference. He sent a complaint to the United States Department of Justice and the FBI requesting an investigation and demanding his attorney's arrest based on her lying to his family and obstructing justice. He claimed she had altered portions of the audio and

---

**4**      Defendant also brought a fifth *Marsden* motion, but rather than address his attorney's performance he complained that Dr. Markman had discriminated against him. The motion was denied.

6

video on the videotape taken at the convenience store on July 16, 2010. Defense counsel informed the court that it was extremely difficult to communicate with defendant.

## II.    The Second Declaration of Doubt Regarding Defendant's Competency

On August 17, 2011, defense counsel declared a doubt as to defendant's competency, saying he was unable to assist in his defense. She had played an audio recording for him and asked him numerous times to stop talking to himself and listen to the recording, but he had difficulty focusing. Counsel restarted the recording several times until finally defendant said he did not need to hear any more, and refused to communicate further. Defendant became fixated on irrelevant points and could not be persuaded to move on. Counsel expressed concern at the paranoia defendant exhibited. He believed she had altered the videotapes and could not be dissuaded from that belief. The court declared a doubt as to defendant's competency and suspended the criminal proceedings. The court appointed Dr. Kaushal Sharma for the prosecution and Dr. Gordon Plotkin for the defense to examine defendant and report on his competency.

On January 4, 2012, defense counsel filed a motion to disqualify Judge James R. Brandlin (Code Civ. Proc., § 170.6), and the case was transferred to Judge Victor L. Wright.

On February 10, 2012, the prosecution filed a motion seeking reinstatement of the criminal proceedings. The prosecutor argued that defendant had failed to provide sufficient evidence that a substantial change in his mental state had occurred and he was therefore not entitled to a second competency hearing.

The trial court held a hearing on March 20, 2012, to determine whether there had been changes in defendant's circumstances to justify holding a second section 1368 hearing to determine competency. Dr. Kaushal Sharma had submitted a report dated September 12, 2011, concluding that defendant was competent. He opined defendant was suffering from "institutional paranoia"—Dr. Sharma's own descriptive term and not a diagnosis—indicating defendant did not trust anyone in the legal system, but that he was not suffering from an identifiable mental disorder. Rather, Dr. Sharma stated that

7

defendant's psychotic-type symptoms were exemplary of a longstanding antisocial personality disorder, making him likely to be disruptive and demanding in court, and to make farfetched requests and bizarre comments when his requests were not met. Defendant insisted he was unjustly kept in jail and instead he should be in a drug diversion program. Defendant told Dr. Sharma he had won $100,000 in a lawsuit for false imprisonment but had used most of the money on drugs. His success in that lawsuit amplified his sense that everyone else is wrong and he is right, and if they disagree with him he wants to sue them. Dr. Sharma predicted defendant could be boisterous, loud, demanding, and intrusive, and blame everyone else for his misfortunes, because he perceives a sense of entitlement when things are not going his way.

At the hearing, the prosecutor asserted that defendant was "playing crazy" in order to delay the proceedings. Defendant had been recorded stating to a friend during a telephone call, "No, no, okay, okay, they want me to play crazy because they mad I been filing all these complaints with the FBI. They said if I do that, I do three years in state hospital or in Patton State Hospital. I can be released and all the charges would be dismissed. Do you want me to do that?"

Dr. Plotkin, who evaluated defendant on February 2, 2011, September 26, 2011, and March 19, 2012, testified that defendant understood the nature of the proceedings against him, and further understood what would happen if he were found to be incompetent. Dr. Plotkin nonetheless found defendant to be incompetent because defendant was unable to cooperate with his attorney. Defendant exhibited prominent paranoid delusions that his attorney was conspiring against him. In his report dated September 30, 2011, Dr. Plotkin stated defendant had irritable affect and paranoia that appeared to be an endogenous illness such as schizophrenia. At the hearing, Dr. Plotkin stated that defendant continued to suffer from the same disorder as previously diagnosed, but said that "its volume ha[d] ra[t]cheted up a little bit." Dr. Plotkin noted that the statement defendant made about "play[ing] crazy" over the telephone indicated he understood what would happen if he were found incompetent, but opined that this did not

8

signify anything regarding his delusions, the existence of which was the reason Dr. Plotkin believed he was incompetent.

The trial court took the matter under submission. Defendant addressed the court on April 18, 2012, making a ninth unsuccessful *Marsden* request to replace his counsel and engaging in a lengthy description of his belief that his counsel was conspiring against him with the prosecutor and the police department, and had fabricated and destroyed videotaped evidence. Counsel provided the court with a similarly comprehensive recitation of the facts regarding her representation of defendant.

On April 18, 2012, the court issued a statement of decision denying the defense request for a new section 1368 hearing. The court found there was no change in circumstances to justify holding new section 1368 proceedings. The court indicated it had reviewed the court file, Dr. Plotkin's testimony and reports, and the reports submitted by Drs. Sharma, Markman, Allen, and Dupee. The court noted its ruling was also based on its observations of defendant, as well as the court's experience as a judicial officer and working in the Los Angeles County Jail in the past. The court found that defendant understood the nature of the proceedings and could cooperate with counsel. However, defendant "makes a concerted effort to display a disruptive attitude, and disrespectful manners toward the Court, his counsel, and the prosecution, particularly when [he] does not obtain his desired outcome at any stage." He "excels at acting out, at being disruptive, and at being uncooperative when he cannot control a situation." The court concluded his behavior was not due to a psychological disorder but instead stemmed from his antisocial background and "from a sense o[f] entitlement." The court ordered the criminal proceedings reinstated.

## III.    The Pretrial Conference

On July 13, 2012, the matter was called for a pretrial hearing. Defense counsel informed the court that a psychiatrist she had enlisted to assist in preparation of the defense case had elected to perform a competency evaluation on defendant, and found him to be psychotic. Defense counsel also told the court that she had visited defendant

recently and he had refused to speak to her. She argued this represented a change in circumstances because previously he would speak to her. Specifically, defense counsel had requested the appointment of Dr. Jack Rothberg to address defense issues but upon meeting defendant Dr. Rothberg decided to perform a competency evaluation. Dr. Rothberg concluded defendant was psychotic, incompetent, and in need of medication. The court indicated it wanted to review Dr. Rothberg's report. Defendant interrupted and asked for a change of venue. The court replied that this request was further evidence that defendant was attempting to manipulate the system. When defendant persisted in speaking after the court asked him to stop, the court removed defendant from the courtroom. Defendant said, "I can't believe you, a Black man. Wow. Working for the KKK."

On July 24, 2012, the court held another hearing to consider Dr. Rothberg's report. Dr. Rothberg indicated he found it "impossible to discuss the facts of the case" with defendant, as defendant kept insisting that he should be exonerated because he was on crack cocaine and therefore not responsible for his actions. Defendant was unable to engage in rational discussion, and was paranoid and delusional. His general intellectual functioning was grossly impaired by psychosis, and Dr. Rothberg saw evidence of a thought disorder. Dr. Rothberg believed defendant would likely be rendered competent to stand trial if treated with anti-psychotic medication but it would likely have to be administered against defendant's will because he lacked the capacity to make a decision about medication. After the court reviewed Dr. Rothberg's report, defense counsel asked the court to declare a doubt as to defendant's competence. The court refused, finding that defendant was attempting to manipulate the system and that he was capable of cooperating with counsel if he chose to do so.

On July 30, 2012, defense counsel stated for the record her continuing belief that defendant was incompetent. The court deemed the defense ready for trial and proceeded. The court held yet another *Marsden* hearing, during which defendant objected to his counsel's failure to call a particular doctor as an expert witness on his behalf. The court responded that it would not permit defendant to hijack the court proceedings. It

10

encouraged defendant to choose to cooperate with his counsel, and denied the *Marsden* motion.

## IV. The Trial

The matter was transferred to Judge Steven Van Sicklen's courtroom for trial on July 31, 2012. Defense counsel reiterated her belief that defendant was incompetent to stand trial. The court noted that defendant's competence had been recently adjudicated and declined to revisit the issue. Defendant requested another *Marsden* hearing, reiterating his claims of conspiracy, destruction and fabrication of evidence, and police misconduct. The court denied the motion.

Later that day, during an evidentiary hearing, defendant disagreed with his counsel's tactics and said she was lying. He then asked to represent himself, which request was denied as untimely. Shortly thereafter he repeated his request, and the court again denied it.

Trial proceeded. On August 8, 2012, defendant again asked to represent himself. The court again denied the request as untimely. Defense counsel reiterated her belief that defendant was incompetent to stand trial. The trial court disagreed, observing that defendant knew exactly what he was doing. Prior to closing arguments that day, defendant told the jury that the preliminary hearing transcript showed the victim knew defendant was under the influence of cocaine during the robbery, and that his attorney was conspiring against him. The court excluded defendant from the courtroom. Defense counsel moved to have defendant declared incompetent, and also for a mistrial. The trial court denied both motions, stating that defendant's outburst was calculated and demonstrated that he was quite competent. Defendant refused to return to the courtroom.

During the sentencing hearing, defense counsel once again argued defendant's incompetency. However, the trial court found that defendant had "willfully chose[n] to be noncooperative."

This appeal from the judgment of conviction followed.

11

**DISCUSSION**

**I.      The Court's Refusal to Hold a Second Competency Hearing**

Due process prohibits trying or convicting a defendant who is mentally incompetent.  (*People v. Rogers* (2006) 39 Cal.4th 826, 846.)  "A defendant is mentally incompetent . . . if, as a result of mental disorder or developmental disability, the defendant is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner."  (§ 1367, subd. (a).)  "It shall be presumed that the defendant is mentally competent unless it is proved by a preponderance of the evidence that the defendant is mentally incompetent."  (§ 1369, subd. (f).)

While a defendant is presumed mentally competent (§ 1369, subd. (f)), due process requires that the trial court conduct a full competency hearing when the accused presents substantial evidence of incompetence.  (*People v. Jones* (1991) 53 Cal.3d 1115, 1152 (*Jones*).)  "Evidence is 'substantial' if it raises a reasonable doubt about the defendant's competency to stand trial."  (*Moore v. United States* (9th Cir. 1972) 464 F.2d 663, 666.)  "At the request of the defendant or his or her counsel or upon its own motion, the court shall recess the proceedings for as long as may be reasonably necessary to permit counsel to confer with the defendant and to form an opinion as to the mental competence of the defendant at that point in time."  (§ 1368, subd. (a).)

However, "[w]hen a competency hearing has already been held and the defendant has been found competent to stand trial, . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of circumstances or with new evidence' casting a serious doubt on the validity of that finding.  [Citations.]" (*Jones*, *supra*, 53 Cal.3d at p. 1153.)  "[O]nce a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry." (*People v. Marks* (2003) 31 Cal.4th 197, 220; see also *People v. Ramos* (2004) 34 Cal.4th 494, 508.)

12

The question here is whether a substantial change of circumstances or new evidence came to light after the first competency hearing in March 2011, such that the trial court abused its discretion by refusing to hold a second competency hearing. We note that although in March 2012 Judge Wright revisited Judge Brandlin's prior decision (made in Aug. 2011) to hold a second competency hearing, defendant does not argue that this was error. He does not assign as error Judge Wright's conclusion on April 18, 2012, that there was no change in circumstances to justify holding new section 1368 proceedings. Rather, he argues that when defense counsel presented new evidence (Dr. Rothberg's evaluation) and again declared a doubt, and the court held a hearing to consider the issue on July 24, 2012, the ensuing July 30, 2012 order by Judge Wright concluding there was no substantial change in circumstances to justify holding a second competency hearing constituted an abuse of discretion. Defendant contends that Judge Van Sicklen's refusal to reconsider the issue when it was assigned to his court for trial the following day also was error.

In considering whether there was evidence of a substantial change of circumstances or new evidence which cast a serious doubt on the validity of the trial court's initial finding of competence, the trial court considered Dr. Rothberg's report, defense counsel's claim that defendant entirely refused to communicate with her, the court file, all of the previous reports, defendant's statement about "play[ing] crazy," the court's own prior experience with competency matters, and its personal observations of defendant. Regarding the latter, the trial court had observed defendant's behavior on numerous occasions. Defendant had addressed the court directly during 10 *Marsden* motions, five of which took place before the prior trial judge (Judge Brandlin) found defendant competent to stand trial, two of which occurred before defense counsel filed a motion to disqualify Judge Brandlin, and two of which occurred before Judge Wright determined that a change in circumstances or new evidence had not been presented to justify holding a second competency hearing. Thus, the court had ample opportunity to observe and interact with defendant, and appropriately took its personal observations into

13

account in determining whether there had been a significant change in the defendant's mental state. (*Jones*, *supra*, 53 Cal.3d at p. 1153.)

The court fully considered the written report by Dr. Rothberg in which he found defendant to be psychotic, incompetent, in need of medication, and a danger to himself because his behavior was likely to be misinterpreted by others who would in turn react against him. Dr. Rothberg indicated he found it "impossible to discuss the facts of the case" with defendant, as defendant kept insisting that he should be exonerated because he was on crack cocaine and therefore not responsible for his actions. Defendant was unable to engage in rational discussion, and was paranoid and delusional. His general intellectual functioning was grossly impaired by psychosis, and Dr. Rothberg saw evidence of a thought disorder. Dr. Rothberg believed defendant would likely be rendered competent to stand trial if treated with anti-psychotic medication.

These same things were said of defendant previously, that he was delusional, paranoid, and unable to assist in his defense. Dr. Plotkin had similarly found in March 2011 that defendant had a major mental disorder and in March 2012 that defendant suffered from prominent paranoid delusions, possibly due to schizophrenia. In his report dated September 30, 2011, Dr. Plotkin had stated defendant had irritable affect and paranoia that appeared to be an endogenous illness such as schizophrenia. At the hearing in March 2012, Dr. Plotkin stated that defendant continued to suffer from the same disorder as previously diagnosed, but said that "its volume ha[d] ra[t]cheted up a little bit."

Although defendant argues on appeal that Dr. Rothberg's evaluation demonstrated that defendant's condition had deteriorated significantly, we find no abuse of discretion in the trial court's disagreement with that characterization of the report and conclusion that a substantial change in circumstances had not been shown. Defendant had grown increasingly more uncooperative and irritable as trial approached, but that is readily explained by the fact that his attempts to manipulate the proceedings were failing and he was on the verge of standing trial. He continued to insist that he should be exonerated because he was on crack cocaine when he committed the offense, refusing to accept that

14

this was not a relevant defense. He persisted in accusing the legal system of conspiring against him. As Dr. Sharma stated, he was certainly exhibiting institutional paranoia and distrust of the legal system, but that his psychotic-type symptoms were exemplary of a longstanding antisocial personality disorder and sense of entitlement, not due to an identifiable mental disorder. Dr. Sharma presciently stated that defendant's antisocial behavior made him likely to be disruptive and demanding in court, and to make farfetched requests and bizarre comments when his requests were not met.

Agreeing with Dr. Sharma's evaluation of defendant, the court refused to declare a doubt as to defendant's competency, finding that defendant was attempting to manipulate the system and that he was capable of cooperating with counsel if he chose to do so. The court noted that defendant was cooperative when he got what he wanted and uncooperative when he did not. The trial court was in the best position to judge defendant's conduct and to evaluate whether his conduct had changed over time, and we will not interfere with the court's decision where no abuse of discretion has been shown. (*People v. Danielson* (1992) 3 Cal.4th 691, 727, disapproved on another ground in *Price v. Superior Court* (2001) 25 Cal.4th 1046.)

Defendant argues that this case is similar to *People v. Melissakis* (1976) 56 Cal.App.3d 52 (*Melissakis*), in which the appellate court concluded the trial court abused its discretion when it found no substantial change in circumstances to justify holding a second competency hearing. We conclude, however, that this case is readily distinguishable from *Melissakis*.

In *Melissakis*, prior to trial defendant had undergone examinations by two psychiatrists and was found sane. Several months later the trial court ordered the doctors to reexamine defendant to determine his present sanity to stand trial. One doctor found he was "laboring under a 'delusional system' and expressed the opinion that appellant was not capable of trusting another person sufficiently to present an adequate defense." (*Melissakis*, *supra*, 56 Cal.App.3d at p. 56.) The trial court ordered a hearing and appointed a third doctor to examine appellant; the latter found no evidence of any significant mental illness. The court found appellant sane and the matter proceeded to

15

trial. On the third day of trial appellant requested the court to subpoena for his defense two issues of Playboy magazine, certain newspaper articles, and various individuals; he informed the court that he wanted to prove that certain organizations had put him in fear for his life and that this in turn resulted in the incident for which he was standing trial. He also said that a women's liberation organization was involved with the military in conspiring against him. Appellant's trial counsel requested the court reconsider appellant's present sanity and his ability to stand trial, but the court denied the request and ordered the trial to continue. (*Id.* at p. 57.) Appellant then testified that a year earlier he became suspicious that a conspiracy was being perpetrated against him by various organizations (narcotics agents, the FBI, military intelligence, a women's liberation organization, police officers, and various workmen), that he was under constant surveillance, and that these groups were attempting to frighten him and physically attack him. A jury found him guilty of assault with a deadly weapon. Thereafter, during a hearing on appellant's sanity, the two doctors who previously found him sane recanted their earlier beliefs that appellant had no discernable psychiatric problem. They agreed with the third doctor that appellant suffered from paranoid schizophrenia. (*Id.* at p. 59.) Nonetheless, the jury found appellant sane at the time of the offense and found him guilty. He appealed, arguing that the judge did not comply with section 1368 when it became apparent during trial that he likely was incapable of understanding the nature of the proceedings or unable to cooperate with his counsel in presenting a rational defense. (*Ibid.*)

In reversing the judgment, the appellate court stated that when the trial court found appellant sane, there also was substantial evidence to support the contrary conclusion, and the factors which came to light at the beginning of and during trial "completely undermined the medical opinions upon which the present sanity finding was predicated." (*Melissakis*, *supra*, 56 Cal.App.3d at p. 60.) "[A] trial judge may not avoid his own responsibility to make proper inquiry regarding a defendant's capacity to stand trial or to understand the nature of the sentencing procedure by relying solely upon a pretrial decision or pretrial psychiatric reports where, during the trial or prior to the sentencing,

16

he is presented with a substantial change of circumstances or with new evidence which casts a serious doubt upon the validity of the pretrial finding of present sanity. (Cf. *People v. Munoz* (1974) 41 Cal.App.3d 62, 66; *In re Miller* (1973) 33 Cal.App.3d 1005, 1021; *People v. Groce* (1971) 18 Cal.App.3d 292, 296-297.)" (*Melissakis*, *supra*, at p. 62.)

The appellate court stressed that it was not second-guessing the trial judge: "If the trial judge had conducted a hearing on the present sanity issue, and on the basis of medical testimony or other evidence presented at the hearing had determined that appellant presently was sane, we would not have disturbed his decision. Here the trial judge made no inquiry of any kind into appellant's mental capacity to stand trial or to understand the sentencing procedure, despite the fact that there were ample reasons, in addition to appellant's bizarre testimony, for renewing the inquiry. For example, even the doctors who testified for the People admitted that they were not aware that appellant had any significant mental illness or that he was suffering from an insane delusion until they heard him testify; yet, they were not asked whether the newly gained information had any effect on their earlier opinions that appellant was able to understand the proceedings in which he was involved and to cooperate with his counsel in the presentation of a rational defense. It is this failure to perform an important judicial function, not what may have resulted from a second hearing, that mandates the reversal." (*Melissakis*, *supra*, 56 Cal.App.3d at p. 62.)

In distinct contrast, in the case before us Dr. Rothberg's report essentially reiterated what Dr. Plotkin had previously found. Defendant continued to act as he had before, making the same accusations that his attorney was conspiring against him and had altered evidence, and arguing that he should be exonerated because he was high on cocaine when he committed the offense. This was nothing new. He chose to be obstreperous rather than cooperate with his attorney, but that too was precisely the same behavior he had previously exhibited. Significantly, unlike in *Melissakis*, none of the experts who determined defendant was competent to stand trial changed his opinion.

17

We conclude defendant failed to provide the court with substantial evidence of a substantial change in circumstances or new evidence that would cast a serious doubt on the validity of the previous finding of competence. We therefore find no error in either Judge Wright's or Judge Van Sicklen's refusal to hold a second competency hearing.

## II.     Denial of *Faretta* Motions

Defendant next contends that the trial court erred when it denied his request, made after the start of trial, to represent himself. He argues that because the request was not accompanied by a request for a continuance, the court erred in refusing to allow it. We disagree.

On July 31, 2012, following a *Marsden* hearing and just prior to jury selection on day eight of ten, defendant said, "I would like to go pro per, Your Honor." The court denied the motion as untimely. Shortly thereafter he repeated his request, and the court again denied it. Defendant again asked to represent himself on August 8, 2012, and the court again denied the request as untimely.

In *Faretta v. California* (1975) 422 U.S. 806, 836 (*Faretta*), the United States Supreme Court held that a defendant in a state criminal trial has a federal constitutional right to represent himself or herself without counsel if he or she voluntarily and intelligently elects to do so. As relevant here, the California Supreme Court has described the right to self-representation under *Faretta* as conditional: "A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently. [Citations.] As the high court has stated, however, '*Faretta* itself and later cases have made clear that the right of self-representation is not absolute.' [Citations.]" (*People v. Lynch* (2010) 50 Cal.4th 693, 721 (*Lynch*), overruled on another ground in *People v. McKinnon* (2011) 52 Cal.4th 610, 636-638.) A *Faretta* motion thus may be denied if the defendant is not competent to represent himself or herself, is disruptive or engages in misconduct that seriously threatens the integrity of the trial, or if the motion is made for the purpose of delay.

18

(*Lynch*, *supra*, at pp. 721-722.)  Likewise, our Supreme Court has long held that a self-representation motion may be denied if it is untimely.  (*Id.* at p. 722.)

"Under [*People v. Windham* (1977) 19 Cal.3d 121, 127-128 (*Windham*)], a motion is timely if made 'a reasonable time prior to the commencement of trial.'  [Citation.]" (*Lynch*, *supra*, 50 Cal.4th at p. 722.)  Neither the United States Supreme Court nor our Supreme Court has articulated a bright line rule with respect to the timeliness of a *Faretta* motion.  In general, courts have held that *Faretta* motions made on the eve of trial are untimely.  (*Id.* at p. 723, citing cases.)  Conversely, such motions made months before trial have been considered timely.  (*Ibid.*)  "[O]utside these two extreme time periods, pertinent considerations may extend beyond a mere counting of the days between the motion and the scheduled trial date."  (*Ibid.*)  The factors to be considered by the court in assessing such requests made after the commencement of trial are "the quality of counsel's representation of the defendant, the defendant's prior proclivity to substitute counsel, the reasons for the request, the length and stage of the proceedings, and the disruption or delay which might reasonably be expected to follow the granting of such a motion."  (*Windham*, *supra*, at p. 128; *Lynch*, *supra*, at p. 722, fn. 10.)

Moreover, "a trial court may consider the totality of the circumstances in determining whether a defendant's pretrial motion for self-representation is timely.  Thus, a trial court properly considers not only the time between the motion and the scheduled trial date, but also such factors as whether trial counsel is ready to proceed to trial, the number of witnesses and the reluctance or availability of crucial trial witnesses, the complexity of the case, any ongoing pretrial proceedings, and whether the defendant had earlier opportunities to assert his right of self-representation."  (*Lynch*, *supra*, 50 Cal.4th at p. 726.)  "An analysis based on these considerations is in accord with the purpose of the timeliness requirement, which is 'to prevent the defendant from misusing the motion to unjustifiably delay trial or obstruct the orderly administration of justice.'  [Citation.]" (*Id.* at p. 724.)

The trial court was not required to explicitly cite the *Windham* factors or state its reasons for denying an untimely request for self-representation.  (*Windham*, *supra*, 19

Cal.3d at p. 129, fn. 6; *People v. Bradford* (2010) 187 Cal.App.4th 1345, 1354.) A trial court's denial of an untimely *Faretta* motion is properly affirmed if substantial evidence supports the inference that the court had the *Windham* factors in mind when it ruled. (*Bradford*, *supra*, at p. 1354.) Although defendant did not explicitly request a continuance, the court was nonetheless entitled to consider the *Windham* factors. (*Id.* at 1355.)

Here, we conclude that the trial court properly rejected defendant's untimely request to represent himself for two primary reasons: (1) the trial court had reason to believe the request was made by defendant in order to obstruct the orderly administration of justice, and given defendant's behavior that would be the inevitable outcome of granting his request for self-representation, and (2) the request was equivocal in that the court had reason to believe it was made solely for purposes of delay.

Implicit in the trial court's denial of the request as untimely is the fact that significant disruption might reasonably have been expected to follow the granting of defendant's motion. (*Windham*, *supra*, 19 Cal.3d at p. 128; *Lynch*, *supra*, 50 Cal.4th at p. 722, fn. 10.) Defendant had been continuously disruptive and refused to follow the basic rules of courtroom etiquette. Had he been allowed to take over his own representation, the court undoubtedly believed that disruption of the proceedings was certain to follow. Indeed, delay was likely to follow as well because defendant had repeatedly wanted a Dr. Knapke to appear as his expert witness because defendant believed that doctor would testify that the cocaine made defendant commit the charged offense; thus, defendant would almost certainly have asked for a continuance to secure that doctor's presence.

Defendant had many previous opportunities to request leave to represent himself, having been represented by three different public defenders, and having addressed the court during numerous *Marsden* motions. Despite the numerous denials of his previous *Marsden* motions and defendant's vociferous distrust of his counsel, he never asked to represent himself until faced with the immediate prospect of going to trial. While he did not ask for a continuance, he also had not shown that he was prepared to proceed to trial

20

immediately. (Cf. *People v. Tyner* (1977) 76 Cal.App.3d 352 [appellate court found denial of request for self-representation on eve of trial was erroneous where no indication of a troubled history likely to lead to disruption of court proceedings, and defendant demonstrated preparedness to proceed immediately by having written out 50 questions with which to cross-examine witnesses].) It was therefore reasonable for the court to conclude that defendant's *Faretta* motion was made in response to the denial of his latest *Marsden* motion and because defendant was faced with the imminent start of trial, rather than because of a genuine desire to serve as his own attorney. This too was a proper reason to deny the motion because such a request for self-representation was "not unequivocal." (*People v. Scott* (2001) 91 Cal.App.4th 1197, 1205-1206.) Defendant was seeking to avoid or at least delay the inevitable. We find no error.

## III.    The *Pitchess* Motion

Defendant requests that we review the in camera proceedings of his *Pitchess* motion to determine whether the trial court properly ruled on the discoverability of information contained in the personnel and administrative files of the arresting officers, Officers Moreno and Charley. We review the trial court's ruling on the *Pitchess* motion for abuse of discretion. (*People v. Hughes* (2002) 27 Cal.4th 287, 330.) The trial court conducted an in camera hearing at which the custodian of records was placed under oath and presented the personnel files of Officers Moreno and Charley. The court reviewed the potentially responsive documents outside the presence of all persons except the custodian and his counsel. The trial court made the appropriate inquiries concerning whether the custodian had produced all potentially responsive documents, and described thoroughly, in the sealed transcript of the hearing, the documents produced. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.) We have reviewed the sealed record of the in camera proceeding and conclude the trial court appropriately exercised its discretion in finding discoverable certain documents from the personnel records of each officer, and otherwise concluding that there was no further relevant, discoverable material to be disclosed. We find no error in the trial court's ruling.

21

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                        SUZUKAWA, J.

We concur:


EPSTEIN, P. J.


MANELLA, J.

22